UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROBERT RAFFERTY,

                  Plaintiff,               **REPORT AND**
                                               **RECOMMENDATION**
        -against-               CV 18-3321 (ADS)(AYS)

HEMPSTEAD UNION FREE SCHOOL
DISTRICT, RODNEY GILMORE, individually
and in his official capacity, REGINA ARMSTRONG
individually and in her official capacity,
FADHILIKA ATIBA-WEZA, individually
and his official capacity, and BETTY CROSS,

                   Defendants.
------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

      Plaintiff Robert Rafferty ("Rafferty" or Plaintiff") commenced this employment

discrimination action against his former employer, the Hempstead Union Free School District

(the "District"), three of the District's board members, and a former member of that board. The

current board members named as Defendants are: (1) Fadhilika Atiba-Weza ("Atiba-Weza"), (2)

Regina Armstrong ("Armstrong") and (3) Rodney Gilmore ("Gilmore") (collectively the "Board

Defendants"). The former board member named as a Defendant is Betty Cross ("Cross")

(together with the aforementioned Board Defendants (the "Individual Defendants").

      Plaintiff's Complaint, appearing as Docket Entry ("DE") 1 herein, alleges eight causes of

action. His federal employment discrimination claims are based on allegations of racial

discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

1981 ("Section 1981") and 42 U.S.C. § 1983 ("Section 1983"). This claim appears as the First

Cause of Action in the Complaint, and is alleged against all Defendants. Plaintiff's Second Cause

of Action, also alleged against all Defendants, alleges retaliation for Plaintiff's complaints of

racial discrimination in violation of Title VII, Section 1981 and Section 1983. This cause of action also alleges retaliation because Plaintiff refused to accommodate inappropriate requests made by the Board on behalf of Defendant Cross, and for Plaintiff's discussion of the District's "illicit financial activities." Plaintiff's Third Cause of Action alleges Federal employment discrimination in violation of the Equal Protection Clause of the United States Constitution. This claim, like the prior claims, is alleged against all Defendants. Plaintiff's Eighth Cause of Action sets forth his final federal claim. This claim alleges that Defendants engaged in acts of conspiracy in violation of 18 U.S.C. §1962 ("RICO").

Plaintiff's state law claims allege employment discrimination in violation of the New York State Human Rights Law, N.Y. Exec. L. §290. These claims are parallel to the Federal employment discrimination claims set forth in Plaintiff's First and Second Causes of Action. Plaintiff alleges State law claims of aiding and abetting against the Individual Defendants in his Fourth Cause of Action, and individual liability against these Defendants pursuant to Section 1983. Plaintiff's Fifth Cause of Action (incorrectly referred to also as a "Fourth Cause of Action") is set forth against all Defendants. That cause of action is a state law claim alleging negligent hiring and supervision. The Sixth Cause of Action, alleging negligent and intentional infliction of emotional distress is also stated against all Defendants. Plaintiff's final state law claim appears as his Seventh Cause of Action. This claim is alleged pursuant to the New York State Human Rights Law, which prohibits retaliation for "whistleblowing" activity.

Presently before this Court, upon referral by the Honorable Arthur D. Spatt, for Report and Recommendation, is the motion of the District and the District Defendants, pursuant to Rule 12 of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Complaint. See DE 14 and 21. As set forth below, this Court respectfully recommends dismissal of all of the claims alleged

pursuant to New York state law as time barred. The Court further recommends that the New York State law claims for negligent supervision/hiring and those for negligent and/or intentional infliction of emotional harm, as well as any alleged pursuant to the New York State whistleblower statute and RICO be dismissed as abandoned.

As to his Federal claims, the Court recommends that the motion to dismiss all claims of race discrimination be granted. The Court further recommends that the motion to dismiss Plaintiff's claim of First Amendment retaliation be denied. Accordingly, as and set forth below, the Court recommends that Plaintiff be allowed to proceed only with the claim that he was terminated in retaliation for exercise of his First Amendment right to speech.

<u>BACKGROUND</u>

I.    <u>Procedural History</u>

Plaintiff filed the Complaint on June 6, 2018. Summonses were thereafter issued as to all Defendants. <u>See</u> DE 7-13. On August 3, 2018, the District and the Individual Board Defendants filed their pre-answer motion to dismiss. DE 14. The docket reflects neither an answer, (nor any motion seeking to extend the time in which to respond to the Complaint) on behalf of Defendant Cross. Nor has Cross joined in the motion that is presently before the Court. Therefore, to the extent that any ruling herein is made dismissing any claim on the merits, that ruling will apply to any such claim as alleged against Cross.  However, any ruling not on the merits, or made expressly with respect to the acts of only those Defendants moving to dismiss it will not necessarily apply to Defendant Cross.

Turning back to the present motion to dismiss, the docket reflects that several extensions of time were granted by the District Court with respect to that motion, and it was finally fully

briefed on February 13, 2019. By order dated March 28, 2019, the motion was referred to this Court for Report and Recommendation.  DE 21.

II.    <u>Documents Considered</u>

While facts to consider in the context of a Rule 12 motion to dismiss are generally limited to those set forth in the pleadings, a court may consider matters outside of the pleadings under certain circumstances. Specifically, in the context of a Rule 12(b)(6) motion, a court may consider: (1) documents attached to the complaint as exhibits or incorporated by reference therein; (2) matters of which judicial notice may be taken; or (3) documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002); <u>see</u> <u>International Audiotext Network, Inc. v. American Tel. and Tel. Co.</u>, 62 F.3d 69, 72 (2d Cir. 1995).

In support of its motion to dismiss, the Defendant has submitted the Complaint herein as Exhibit C to the attorney declaration of Austin Graff, Esq. <u>See</u> DE 14-1. Additionally, Defendants submit documents outside of the pleadings, referred to as Exhibits A, B, D, E, F and G as follows:

- Exhibit A:    Minutes of the District Board dated July 19, 2016;

- Exhibit B:    Minutes of the District Board dated December 15, 2016;

- Exhibit D:    Plaintiff's Notice of Claim;

- Exhibit E:    Plaintiff's Amended Notice of Claim;

- Exhibit F:    Transcript of Plaintiff's hearing held pursuant to Section 50-h of the New York State General Municipal Law, and

- Exhibit G:    <u>Newsday</u> article detailing the allegations set forth in Plaintiff's Complaint, including commentary by Plaintiff's counsel.

<u>See</u> Affirmation of Austin Graff, Esq., in Support of Motion to Dismiss ("Graff Aff."), DE 14-1-8.

Plaintiff makes no objection the consideration of any of the afore-mentioned documents in connection with deciding this motion to dismiss. Nonetheless, the Court deems it appropriate to consider only the allegations of the Complaint, Plaintiff's notices of claim, and the transcript of his 50(h) hearing. The latter two documents, while outside of the pleadings, are referenced in the Complaint, and form an integral part of the facts pled therein. <u>See</u> <u>Cincotta v. Hempstead Union Free Sch.Dist.</u>, 2016 WL 4536873, *8 (E.D.N.Y. August 30, 2016) (considering notices of claim and transcript of 50-h hearing in context of motion to dismiss). The Court declines to consider the other submitted documents that are outside of the pleadings, <u>i.e.</u>, the minutes of the Board, and the <u>Newsday</u> article. With the appropriately considered documents in mind, the Court turns to outline the facts relevant to the pending motion.

III.    <u>The Allegations of the Complaint</u>

Plaintiff's Complaint contains a highly detailed description of facts offered in support of his claims. As required in the context of this motion to dismiss, the factual allegations in the Complaint, though disputed by Defendants, are accepted to be true for purposes of this motion, and all reasonable inferences are drawn therefrom in favor of the Plaintiff.

A.    <u>In or Around July of 2016</u>

Plaintiff is a 56-year-old Caucasian male who was appointed to the District position of "Director of Facilities Level III" by the Board. He began work in this capacity on July 25, 2016. Compl. ¶¶ 4; 8. Plaintiff was interviewed by Defendant Atiba-Weza, who is African American

and thereafter hired by the District. Compl. ¶ 11 Transcript of Hearing held on May 4, 2017, conducted pursuant to Section 50-h of the General Municipal Law; DE 14-7 (hereinafter "Tr") at 32. With the exception of two Caucasian secretaries working in his office, Plaintiff's supervised a workforce of approximately 75 employees who were either African-American or Hispanic. Compl. ¶ 8.

Plaintiff states that shortly after commencing employment with the District, the two secretaries working in his office, Debra Casesse ("Casesse") and Marge Kazorkowski ("Kazorkowski') expressed their opinions that the District was racist against Caucasian employees, and cited several examples of inequitable treatment, "by previous Superintendents" in support of their opinions. Compl. ¶ 10; see Tr. at 16. They also stated their collective opinion that Defendant Atiba-Weza would not even acknowledge them in his presence. Plaintiff stated that he found this to be "unusual" since Atiba-Weza requested that Plaintiff report directly to him, and to no one else. Compl. ¶ 11.

Plaintiff's complaint contains several factual assertions concerning Defendant Cross, and her relationship with the Board and the District. Plaintiff states that even though Cross is no longer a Board member, she continues to wield influence and power in the District. He alleges that Cross has direct input on all District decisions, and that her decisions were routinely adopted and endorsed by the Board. Compl. ¶16. He concludes that she should therefore be deemed a current de facto member of the Board.

In support of his conclusions regarding the relationship between Cross and the District, Plaintiff describes several incidents involving Cross. First, he describes an incident that took place on his first day of work. On that day, Cross is alleged to have called Plaintiff's office, demanding that District-owned tables and chairs be set up for her grandson's birthday party.

Compl. ¶ 12.  Plaintiff recounts Cross making a threat to him that she would "have his ass" if he did not comply with her wishes. Compl. ¶¶12-15. Plaintiff was told by his secretary that "we do lots of favors for Ms. Cross" suggesting that Cross extorts favors from district employees in exchange for their being able to continue working for the District. Compl. ¶ 15. Thus, Plaintiff alleges Cross's improper influence over District hiring decisions.

As to allegations of racism against Caucasian employees, Plaintiff states that from July 26, 2016, through July 29, 2016, the opinions expressed by Casesse and Kazorkowski regarding the racist attitude in the District, were echoed by other District employees who "warned plaintiff about the District's racist tendencies". Compl. ¶ 17. These employees are identified as District Directors, and include an African American Director. Id. One of those directors, Sharon Gardner, serves as the coordinator for the New York State Administrators Association. She is alleged to have urged Plaintiff to join that association. After "gesturing towards Plaintiffs skin color", Gardner is stated to have implied that it would simply be a matter of time before Plaintiff would need that group's representation. Compl. ¶ 18.

With respect to illegal hiring practices, Plaintiff alleges that in July of 2016, he was directed to rehire a previously terminated African-American substitute employee named George Wyche ("Wyche"). Compl. ¶19; Tr. at 29.  Plaintiff states that Wyche was improperly classified as a full-time employee with rights pursuant to a collective bargaining agreement. Compl. ¶ 20. According to Plaintiff, Wyche was afforded special treatment because he was hired by Cross, and also due to Cross's relationship with Wyche's mother. Compl. ¶ 20-22. Plaintiff alleges, upon information and belief, that Defendant Gilmore and Wyche's mother met to discuss Plaintiff in private. He also states that Wyche's mother vilified Plaintiff in Board Meetings, and that she met with Atiba-Weza on two separate occasions to complain about Plaintiff. These

interactions are stated to have confused the Plaintiff, because Mr. Wyche himself was not complaining. Compl. ¶ 21-23.

Plaintiff states that on or about July 31, 2016, he discovered that he had no access to his computer budgeting program, and that he was denied access after making a request to Calvin Wilson ("Wilson") Compl. ¶24. Plaintiff claims that as a result of the District's denial of access to his budgeting program, he reviewed paper invoices, and discovered unpaid invoices amounting to over $1,000,000. Compl. ¶25. He states that he reported this discovery to Atiba-Weza, who responded that the invoices would be paid from the previous years' budget. Compl. ¶26. However, it is Plaintiff's position that such invoices were paid out of his budget. In any event, Plaintiff states that he was put in the position of being unable to place purchase orders for necessary goods and services, including extermination. The lack of an exterminator is said to have resulted in rodent infestations which jeopardized District heating systems. In addition, due to his inability to pay the boiler maintenance company, the heating of many buildings within the district were at peril. Compl. ¶27.

C.    In or Around August of 2016

Plaintiff alleges that in or around the first week of August 2016, he was required to make employment decision as to the duties of a custodian. He alleges that those decisions were dictated by Defendant Armstrong, an African American who, during the relevant time period, was the Assistant Superintendent of Primary Education. When Plaintiff inquired as to Armstrong's interest in the duties of this custodian, he was told of a rumor that Armstrong was involved in an intimate relationship with the employee. Compl. ¶¶ 29-31. This same employee later complained that the Plaintiff cheated him out of pay for overtime work, which, according to the Plaintiff, led to the employee being given benefits such as being assigned to a leased building

8

that was already equipped with a cleaning service. Compl. ¶30. Around this time, Armstrong is stated to have told Plaintiff that new furniture that she purchased for all five District elementary schools would be delivered two days prior to the start of the school year. Plaintiff claims that he told warned Armstrong that this might conflict with the final cleaning of the school's floors, which Armstrong ignored. Against Plaintiff's advice, Armstrong demanded that Plaintiff ensure that the delivery happened on the date she specified. Compl. ¶30. Plaintiff alleged that when he could not find records for said furniture purchases, he was informed that Armstrong had purchased the furniture on her own, using the District's money, and falsifying records to avoid needing approval from the board. Compl. ¶32. Plaintiff alleges that upon learning this information, he decided to check the condition of the furniture to be replaced to confirm the necessity of the purchase. Plaintiff claims that his inspection revealed that the existing furniture was in excellent condition, and that its unnecessary replacement cost the District approximately $700,000.00. Compl. ¶33. Nonetheless, after much debate between Armstrong and Plaintiff about where to move the old furniture, Plaintiff claims that Armstrong ordered Plaintiff's assistant to move the furniture to a new location at night without Plaintiff's knowledge. Compl. ¶34.  Plaintiff claims that from this point on, Armstrong continued to complain about Plaintiff for months, leading verbal attacks on Plaintiff at cabinet meetings, including a false accusation that Plaintiff failed to file a state mandated inspection, and was therefore trying to harm African American children. Compl. ¶36. Plaintiff alleges that these meetings were purposefully scheduled with no notice, leaving him no time to prepare. Compl. ¶ 35.  Plaintiff claims that at three of these meetings, he was directed to sit on one side of a conference table while his African American co-members and other meeting invitees sat opposite him. Tr. 47-48. Plaintiff claims that he felt under attack, because the other attendees would ask irrelevant questions concerning

Plaintiff's job duties, mock Plaintiff's responses, and accuse him of failing to perform duties that resulted in minority children being placed in danger. Plaintiff alleges that whenever he would offer a rebuttal to accusations, he was told by Superintendent Atiba-Weza to "shut up Mr. Rafferty" and "if you speak again I will fire you". Compl. ¶37; Tr. 52-53.

Plaintiff's allegations as to this time period continue to refer to the influence of Cross within the District. Thus, Plaintiff claims that around this time he was instructed by Abita-Weza to provide transportation for Cross from her house to her attorney's office. Plaintiff states that he advised Abita-Weza that his department did not have the appropriate vehicles for the job, and suggested that security handle the transportation, as it has done in the past. After being told to "make it happen", Plaintiff instructed his driver to pick up Ms. Cross. Plaintiff alleges that forty-five minutes later he received a call from an enraged Cross who proceeded to yell that the van wasn't at her house. Plaintiff claims that even after the driver arrived at Ms. Cross's house, she continued to shout vulgarities at Plaintiff, saying "I'll have you fucking fired!" Plaintiff alleges that the following day, Abita-Weza told him that he had handled the situation improperly, agreeing with Cross, again conflating Cross's decisions with those of the District. Compl. ¶ 39.

Plaintiff states that in mid-August of 2016, he and all of the department heads were invited to give a presentation as to the direction of their department. Plaintiff claims that he requested to give the first presentation as he had multiple obligations that day. He states that as a result of his request, he was made to go last. During this presentation, according to Plaintiff, Abita-Weza physically removed Plaintiff from the stage, stating "you talk too much." Compl. ¶ 41; Tr. 57.

Plaintiff's description of his relationship and experience with Defendant Atiba-Weza through mid-August 2016 are not marked by any accusations of racism. To the contrary, Plaintiff

describes Atiba-Weza during this time period as being "very friendly" to Plaintiff, and inviting

him to play golf and join him for lunch, which invitations Plaintiff declined. Compl. ¶28; Tr. 31.

Indeed, shortly after the presentation, Plaintiff alleges that Atiba-Weza privately acknowledged

his friendship with Plaintiff.  However, Atiba-Weza is stated to have expressed his concern that

others might question that relationship, wondering why he, Atiba-Weza, was friends with a

"white guy". Atiba-Weza advised Plaintiff to "play ball with him" and to follow his lead so he

could protect him from the Board. Compl. ¶ 42-43; Tr. 58-59. Shortly after, Atiba-Weza is then

said to have threatened to fire Plaintiff if he was to talk to him in public or acknowledge his

presence. Compl. ¶ 44.

      D.    <u>In or Around September of 2016</u>

      In early September of 2016, Atiba-Weza emailed Plaintiff regarding a late filing notice

with respect to lead tests, and scheduled a meeting to discuss the matter the following day. After

being told that the situation was unacceptable, Plaintiff explained that he had no budget for the

testing, and that his predecessor was to blame. He also stated that he had nonetheless handled the

situation by asking a favor of Executive Director of Health and Safety of Nassau County Boces,

Pete Deluca, who was apparently at Atiba-Weza's office when this matter was discussed. Compl

¶ 46-47. Plaintiff then told Atiba-Weza that it was he, and not Plaintiff, who was responsible for

filing the reports, and that Atiba-Weza was the one who failed to make the required filings.

Compl. ¶ 48. At this point, Atiba-Weza became angry and ejected Deluca from his office. Atiba-

Weza then sent Plaintiff an email warning him to never speak to "outsiders from Nassau

BOCES" and that he was tired of their interference with the District's business. He said to

Plaintiff, "so all this trouble came from you, thank you very much", and stormed out of

Plaintiff's office. Compl. ¶ 49. Plaintiff states that at the next Board Atiba-Weza wrongfully

accused Plaintiff of mishandling the District's lead abatement program and otherwise criticized Plaintiff's performance.  Plaintiff also states that he was falsely accused of throwing a chair at that meeting of the Board. Compl. ¶ 50-51.

In or around September of 2016, Plaintiff allegedly made a request to replace employees who exhibited poor performance with new employees, a request that was denied by Gilmore. Compl. ¶ 52.  After reviewing files of previous employees, Plaintiff identified time and leave issues with a large part of the workforce, as well as poor performance evaluations of employees, all of which Gilmore denied. Compl. ¶ 55. Plaintiff tied the retention of these employees to Cross's influence in District business, claiming that staff believed Gilmore to be acting under Cross's direct orders, protecting people that Cross hired. Compl. ¶ 56. In further support of his allegations as to Cross's influence, Plaintiff claims, upon information and belief, that Cross sold District jobs in exchange for buying raffle tickets that she sold. Plaintiff states, upon information and belief", that he and other employees were forced to buy these tickets, and that refusal to do so would result in termination and/or withholding of overtime pay. Compl. ¶ 56.

Around this time, Plaintiff states that he requested and was denied a District cell phone, as well as a tablet to use at meetings and in the field, a benefit afforded to every other Director. In addition, Plaintiff saw that the cellphone bills of African-American coworkers were being paid by the District. Compl. ¶ 57.

E.    In or Around October of 2016

Plaintiff alleges that in and around October of 2016, he was accused of not responding to Atiba-Weza's emails, a matter as to which Plaintiff took particular offense, as Atiba-Weza was ignoring Plaintiff's emails. Compl. ¶ 58. Around this same time, Calvin Wilson resigned and was replaced by new Assistant Superintendent Gene Levinstein, a Caucasian male. Mr. Levinstein

resigned after just two weeks and was replaced by a former employee of the district who was African American. Compl. ¶ 59.

Around this time, Plaintiff states that Atiba-Weza blamed Plaintiff, in public, for mismanaging the District's lead test Program. Plaintiff considered this to be a deflection of blame because he realized that it was Atiba-Weza who failed to file documents on behalf of the District. Around the same time, Plaintiff was accused of putting minority children at risk of being poisoned, and was soon after instructed to cease communication with BOCES. Compl. ¶ 61-62.

During this same time period, Plaintiff became aware of a violent African American employee, Dexter Stembridge. Tr. 79. Plaintiff alleges that on multiple occasions he was threatened by Stembridge with violence, and was fearful of him. Plaintiff allegedly filed a workplace violation charge which he states was ignored by Human Resources. Compl. ¶ 63. Plaintiff claims that Abita-Weza continuously allowed Stembridge to come back to work despite numerous suspensions for violent altercations with co-workers. Compl. ¶ 64. Plaintiff states that he was instructed by Gilmore to transfer Stembridge to Prospect School, at which point Plaintiff advised Gilmore that Stembridge should not return to work until he completed a mandatory Anger Management program, and suggested termination on the basis of Stembridge's history of violence and misconduct. Plaintiff claims that no action was taken against Stembridge, and that Gilmore falsely claimed that there was no indication of Stembridge having a disciplinary history. When Plaintiff questioned why this was, he was informed that Stembridge was friends with Cross. Compl. ¶ 65-66.

Around this time, Atiba-Weza got into a verbal altercation with a PSEG crew and directed Plaintiff to email the PSEG Customer Service Representative and insist that the

altercation was the crews' fault, then suggesting that Plaintiff take the blame for the incident. Compl. ¶ 67. It was at this time, Plaintiff claims, he became more aware of Abita-Weza's anger management issues, citing an example in which Atiba-Weza told three Caucasian employees that he was going to call the state police and have them all arrested for breaking the law, holding them accountable for all illegal acts committed in the District. Plaintiff alleges that Abita-Weza later confided in him that he thought the employees were all "pieces of garbage". Plaintiff cites another example in which the police had to escort a parent off the premises with whom Abita-Weza was having a heated. Compl. ¶ 68.

Plaintiff claims that during this time Atiba-Weza began meeting with Timothy Gregg, Plaintiff's African American assistant, consulting Gregg on various Department issues, even though Gregg lacked qualifications for the jobs given to him in the following weeks. Compl. ¶ 70. Plaintiff states that Gregg's title had been fabricated by the District as he does not appear on the civil service job list, and that he was being overpaid. Plaintiff claims that Abita-Weza had instructed Gregg to perform certain duties without Plaintiff's knowledge. Compl. ¶ 69-71.

F.   In or Around November of 2016

Plaintiff, who had been placed on notice by the District's insurance carrier to improve and replace equipment, suggested that District vehicles and equipment be replaced due to poor condition, and lack of snow removal equipment. Compl. ¶ 72. At this time, the District only had one vehicle for plowing and a few snow blowers. According to Plaintiff, Atiba-Weza had expressed concern about snow removal, but denied Plaintiff's purchase of two new trucks. Compl. ¶ 73. Shortly thereafter, due to budget concerns, Plaintiff was directed to prepare confirmatory purchase orders and to sign off on jobs and supplies provided before he began

14

working for the district. Plaintiff refused as this was illegal and against state regulation. Compl. ¶ 74.

G.     In or Around December of 2016

During this time period, Plaintiff was directed by Human Resources to interview substitutes for positions, none of whom were hired. Compl. ¶ 75. At around the same time, Plaintiff called a meeting with Wyche, who was performing inadequately, to initiate his termination. During the meeting, Wyche proceeded to curse and throw papers on the ground, stating "I'm done", a statement that Plaintiff considered to be Wyche's resignation. Compl. ¶ 76. The following day, Plaintiff received an email from Gilmore stating that Plaintiff had violated Wyche's collective bargaining rights as a union employee, which Plaintiff disputed. Following this, Plaintiff was accused of illegally transferring Stembridge. Compl. ¶ 78. Plaintiff was thereafter called into a disciplinary meeting, during which Atiba-Weza directed Gilmore to have Plaintiff arrested and escorted off the premises, which Gilmore refused to do. Compl. ¶ 81. A few minutes later, Plaintiff was criticized by Abita-Weza. In front of Gilmore and Gregg, Atiba-Weza accused Plaintiff of having wasted everyone's time for providing false information about Wyche and Stembridge. Compl. ¶ 82. Plaintiff requested that Mr. Gregg not be present in a discussion about Plaintiff's performance, causing Abita-Weza to lunge across the table in an attempt to grab Plaintiff and scream "what are you fucking crazy?" Compl. ¶ 83. Later that evening Plaintiff received a letter stating he was being recommended for termination, a decision ultimately adopted by the District. Compl. ¶ 84.

IV.    The Motion to Dismiss

Defendants' motion to dismiss is based on a variety of grounds. Because, as discussed below, Plaintiff appears to have abandoned certain claims, and others are easily disposed of on

statute of limitation grounds, the Court here summarizes only the arguments Defendants make as to Plaintiff's claims of race discrimination and First Amendment retaliation.

A.      Grounds Alleged to Dismiss Race Discrimination Claims

As to claims of direct race discrimination, (whether alleged pursuant to Title VII, 42 U.S.C. §§ 1981, 1983 or the Equal Protection Clause of the Constitution), Defendants argue that the only adverse action that Plaintiff can claim is his termination. They therefore argue that to the extent that any claim is sustained, the only adverse action that can be litigated is Plaintiff's termination. Even putting aside the adverse action argument, Defendants argue that Plaintiff can show no facts in plausible support of the notion that any employment action taken was racially motivated. Thus, they characterize the facts set forth in the complaint as insufficient to state a plausible claim of race discrimination.

B.      Grounds Alleged to Dismiss First Amendment Retaliation Claim

In support of the motion to dismiss Plaintiff's claim of First Amendment retaliation Defendants argue that Plaintiff's speech was made within the scope of Plaintiff's duties as a District employee, and therefore cannot form the basis of a claim of First Amendment retaliation.

DISCUSSION

I.   Legal Principles: Standards Applicable on Motions to Dismiss

A.      Rule 12(b)(6)

As noted above, this Court must, at this stage of the proceedings, accept all factual allegations in the complaint as true and to draw all reasonable inferences in the plaintiff's favor. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221, 227 (2d Cir. 2012).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" Iqbal, 556 U.S. at 678-79 (quoting, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Arista Records, LLC v. Doe 3, 604 F.3d 110, 119–20 (2d Cir. 2010).  Facial plausibility is established by pleading factual content sufficient to allow a court to reasonably infer the defendant's liability. Twombly, 550 U.S. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 555. Nor is a pleading that offers nothing more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," sufficient. Iqbal, 556 U.S. at 678 (2009) (quoting Twombly, 550 U.S. at 555).

In addition to the Iqbal standards, a court deciding a motion to dismiss a claim of employment discrimination must also consider the prima facie elements of plaintiff's case in the context of the standards and burdens set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Littlejohn v. City of New York, 795 F.3d 297, 304; 310 (2d Cir. 2015) (Title VII); Dawson v. New York City Transit Authority, 2015 WL 5438790, at *2 (2d Cir. 2015). Just as the McDonnell Douglas "temporary presumption" reduces the facts a plaintiff must show to defeat a motion for summary judgment, that same presumption "also reduces the facts needed to be pleaded under Iqbal." Littlejohn, 795 F.3d at 310; see Jones v. Target Corp., 2016 WL 50779, at *2 (E.D.N.Y. 2016). Thus, at the pleading stage, plaintiff is required only to allege facts to afford "plausible support" for the "reduced requirements" of the prima facie case. Jones, 2016 WL 50779, at *2; see Dawson, 2015 WL 5438790, at *1–2; see also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 84 (2d Cir. 2015) ("a plaintiff is not required to plead a prima facie case under McDonnell Douglas . . ." and "need only give plausible support to a minimal inference of discriminatory motivation.").

To be clear, the elements of the <u>prima facie</u> case are considered in the context of a motion to dismiss, not to determine whether plaintiff states a <u>prima facie</u> claim, but because they "provide [a helpful] outline of what is necessary to render [a plaintiff's] claims for relief plausible." <u>Friel v. County of Nassau</u>, 947 F. Supp. 2d 239, 251 (E.D.N.Y. 2013) (quoting <u>Sommersett v. City of New York</u>, 2011 WL 2565301, at *5 (S.D.N.Y. 2011)).

Before turning to assess the viability of Plaintiff's claims, the Court discusses first those claims that Plaintiff appears to have abandoned. Next, the Court discusses the timeliness of the claims alleged pursuant to New York State law. Finally, the Court discusses the viability of Plaintiff's Federal claims.

II.    The Failure to Respond to the Motion as to Certain Claims
       <u>Requires that Those Claims Be Dismissed as Abandoned</u>

Defendants seek dismissal of all of Plaintiff's claims. In apparent recognition that certain claims clearly do not state a claim, Plaintiff fails completely to respond to Defendants' motion as to those claims. In particular, Plaintiff does not even attempt to respond to the motion with respect to his claims of:

- negligent hiring and supervision (the Fifth Cause of Action – incorrectly referred to as the Fourth Cause of Action);

- negligent and intentional infliction of emotional distress (the Sixth Cause of Action);

- New York State whistleblower claim (the Seventh Cause of Action), and

- Civil RICO (the Eighth Cause of Action).

Plaintiff's failure to respond to Defendants' arguments with respect to these causes of action requires that they be dismissed as abandoned.

III.    <u>The New York State Claims Are Time -Barred</u>

New York law provides for a one year statute of limitations for actions commenced against school districts and/or their supervisory staff or employees. N.Y. Educ. L. § 3812.2; see Gerardi v. Huntington Union Free Sch. Dist., 2015 WL 5062451, at *24 (E.D.N.Y. 2015); Dimitracopoulos v. City of New York, 26 F. Supp.3d 200, 211 (E.D.N.Y. 2014). As discussed above, Plaintiff was terminated on December 15, 2016. This action was commenced on June 6, 2018 and therefore, pursuant to the plain language of the New York limitation period, Plaintiff's state law claims are time barred.

In an effort to avoid the one year statute, Plaintiff argues that the statue is tolled by the filing of his EEOC complaint prior to the expiration of the one year time period. Plaintiff's attempt to evade the statute of limitations is without merit. First, this court has held clearly that such a filing does not toll the running of the one year statute of limitation set forth in the New York Education Law. Cincotta v. Hempstead Union Free Sch. Dist., 2016 WL 4536873, *17 (E.D.N.Y. August 30, 2016).  Moreover, the one case relied upon by Plaintiff to avoid this principle of law is a Report and Recommendation filed in a case litigated in the Southern District of New York, that was not ultimately adopted by the District Judge. In that case the District Court specifically declined to accept the proposition argued by Plaintiff, i.e., that the one year statute should be tolled. See Ricardo v. New York City Dep't. of Educ., No. 16-4891 (S.D.N.Y. January 4, 2017) (DE 20-2). There, the Magistrate Judge's Report and Recommendation disagreed with this Court's ruling in Cincotta, and recommended tolling the statute of limitations so as to save the state law claims from the one year statute of limitations. However, upon review of the Report and Recommendation upon which Plaintiff relies, the District Court sustained defendants' objection, and dismissed the state law claims as untimely. Id. at 2.

In light of the foregoing, the Court recommends that all state law claims be dismissed as untimely.

IV.    The Federal Claims

    A.    Legal Standards: Title VII; 42 U.S.C. § § 1981 and 1983

    i.    Title VII

Under Title VII, it is an "unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(1). To survive a motion to dismiss, claims alleging Title VII discrimination must satisfy a two-part test. Vega, 801 F.3d 72, 85 (2d. Cir. 2015). Specifically, a plaintiff must "plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." Id.

Adverse employment action is action that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Vega, 801 F.3d at 85. (internal citations omitted). Such actions are those that are "more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir 2000) (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). Examples include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.'" Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir.2003) (quoting Galabya, 202 F.3d at 640); see also Conforti v. Sunbelt Rentals, Inc., 201 F.

Supp. 3d at 292. A plaintiff opposing a motion to dismiss faces a "minimal" burden to establish an adverse employment action. Littlejohn, 795 F.3d at 313.

As to motivating factor in the context of a motion to dismiss, facts alleged in a pleading "need only give plausible support to a minimal inference of discriminatory motivation." Littlejohn, 795 F.3d at 11.  To satisfy this requirement, a plaintiff must allege facts "sufficient to plausibly suggest [a defendant's] discriminatory state of mind" and "conclusory allegations are not entitled to the presumption of truth." Buckley v. New York, 959 F. Supp. 2d 282, 296 (E.D.N.Y. 2013) (quoting Sank v. City Univ. of N.Y., 2011 WL 5120668, at *9 (S.D.N.Y. 2011)). Like the burden with respect to adverse action, the plaintiff's burden as to discriminatory motivation at the pleading stage is also 'minimal'— he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" Vega, 801 F.3d at 87 (quoting Littlejohn, 795 F.3d at 311). "A plaintiff can meet that burden through direct evidence of intent to discriminate ... or by indirectly showing circumstances giving rise to an inference of discrimination." Vega, 801 F.3d at 87 (internal citations omitted). In making a determination as to plausibility of racial motivation, the court "must be mindful of the 'elusive' nature of intentional discrimination" and that "rarely is there 'direct, smoking gun, evidence of discrimination.'" Id. (internal quotation marks and citations omitted); see also Conforti v. Sunbelt Rentals, Inc., 201 F. Supp. 3d 278, 294 (E.D.N.Y. 2016). In the Title VII context, a plaintiff "need-not allege 'but-for' causation" to establish the "motivating factor" element. Vega, 801 F.3d at 85.

　　　　ii.　　42 U.S.C. § 1983

42 U.S.C. § 1983 ("Section 1983") provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of

Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. Section 1983 claims "mirror" Title VII discrimination claims. Vega, 801 F.3d at 91. However, claims brought under Section 1983 must also allege action taken by a state actor. Vega, 801 F.3d at 88. Additionally, in cases brought under Section 1983, a Plaintiff must meet the higher causation standard of showing "but for" causation, i.e.., that the adverse action would not have occurred "but for" discriminatory motive. Naumovski v. Norris, 2019 WL 3770193, *6-7 (2d Cir. August 12, 2019).

       iii.    42 U.S.C. § 1981

42 U.S.C. § 1981 ("Section 1981") provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts[.]" 42 U.S.C. § 1981. Thus, Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 224 (2d. Cir. 2004). Section 1981 "does not provide a separate private right of action against state actors." Duplan at 621. See also Chioke v. Dept. of Ed. of City of New York, 2018 WL 3118268, at *15 (E.D.N.Y. June 25, 2018). Instead, a plaintiff who claims that a state actor has violated Section 1981, must bring his claim under Section 1983. Indeed, Section 1983 "provides the sole cause of action available against state actors alleged to have violated § 1981." Duplan v. City of New York, 888 F.3d 612, 616 (2d. Cir. 2018); see Jett v. Dallas Independent School District, 491 U.S. 701, 733 (1989).

Section 1981 claims are subject to the same standard as Title VII claims, with the additional caveats of state action and "but for" causation. See Vivenzio v. City of Syracuse, 611

F.3d 98, 106 (2d. Cir. 2010) (holding that the "standards applicable to claims of employment discrimination under Title VII" are "also generally applicable to claims of employment discrimination brought under § 1981, the Equal Protection Clause"); see also Mears v. Allstate Indemnity Comp. 336 F.Supp.3d 141, 149 (E.D.N.Y. 2018); McDowell v. North Shore-Long Island Jewish Health Sys. Inc., 788 F.Supp.2d 78, 81 (E.D.N.Y. 2011).

      iv.    <u>Equal Protection</u>

Allegations of discrimination based on race or gender discrimination may form the basis of Section 1983 claims predicated on the violation of a plaintiff's rights under the Equal Protection clause of the Fourteenth Amendment. Indeed, "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause." <u>Patterson</u>, 375 F.3d 206, 225 (2d Cir. 2004) (finding that a plaintiff could assert separate claims under Title VII and Section 1983 for race discrimination). Again, for Plaintiff's equal protection claims to survive a motion to dismiss, they must meet the requirements referred to above with respect to his claims under Section 1983.

      v.    <u>Retaliation under Title VII, Section 1983 and Section 1981</u>

Title VII prohibits an employer from "discriminat[ing] against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. Title VII retaliation claims must satisfy a two-part test to survive a motion to dismiss. Specifically, a plaintiff must plausibly allege that: (1) defendants took an adverse employment action against him, and (2) that such action was taken because plaintiff engaged in activity protected by Title VII, such as complaining of discrimination or

opposing any unlawful employment practice." Vega, 801 F.3d at 90 (internal quotations omitted).

In the Title VII retaliation context, "adverse employment action" is read more broadly than in the Title VII discrimination context. Vega, 801 F.3d at 90. Thus, adverse employment action sufficient to support a retaliation claim is "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Id. at 90, quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). Unlike discrimination claims, a plaintiff bringing a Title VII retaliation claim, "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." Vega, 801 F.3d at 90; see also Amaya v. Ballyshear LLC, 295 F. Supp. 3d 204, 222 (E.D.N.Y. 2018). "[P]rotected activity followed closely in time by adverse employment action" can show "retaliatory purpose." Vega 801 F.3d at 90.

"[R]etaliation claims alleging an adverse action because of a complaint of discrimination are actionable under § 1983." Vega, 801 F.3d at 80. Section 1981 retaliation claims are subject to the same general standards that govern Title VII and Section 1983 claims. LeGrand v. Walmart Stores East, LP, F. App'x, 2019 WL 3026881 (2d. Cir. July 11, 2019); see also Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d. Cir. 1988) ("the elements required to make out a claim of retaliatory discharge under 42 U.S.C. § 1981 are the same as those required to make out such a claim under Title VII"); Amaya, 295 F.Supp.3d at 226. To sustain a retaliation claim under Section 1981, "the retaliation must have been in response to the [plaintiff's] assertion of rights" that were protected by the statute. Hawkins v. 1115 Legal Service Care, 163 F.3d 684, 693 (2d. Cir. 1998). Thus, "[a]n act of retaliation for engaging in activity protected by Title VII does not necessarily give rise to a claim for retaliation that is cognizable under Section 1981. Such

parallel claims are properly stated only if the protected activity alleged was also protected by Section 1981. Id. at 693.

vi.    <u>First Amendment Retaliation</u>

To establish a claim of retaliation based upon the exercise of First Amendment rights a plaintiff must show that: (1) he engaged in Constitutionally protected speech because they spoke on a matter of public concern; (2) he suffered adverse employment action and (3) that the exercise of protected speech was a motivating factor in the adverse employment action. <u>See Looney v. Black</u>, 702 F.3d 701, 717 (2d Cir. 2012). A municipal employee alleging First Amendment retaliation must show that the speech alleged was not made pursuant to his official duties. This is because speech that is part of a municipal employee's duties is not protected speech within the meaning of the First Amendment. <u>Garcetti  v. Ceballos</u>, 547 U.S. 410, 421 (2006). The question of whether the speech of a public employee is protected by the First Amendment "is not susceptible to a brightline rule." <u>Ross v. Breslin</u>, 693 F.3d 300, 306 (2d. Cir. 2012). When determining this issue a court must consider "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two". <u>Id</u>. Additionally, the court must consider the context in which the speech was made, including whether the speech was directed to the public. <u>Id.</u>

vii.    <u>Individual and Municipal Liability for Federal Claims Alleged</u>

Title VII "does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers." <u>Littlejohn</u>, 795 F.3d at 313. Individuals may, however, be liable under Section 1983. Such liability attaches only if the individual sought to be held accountable "is personally involved in the alleged deprivation." <u>Littlejohn</u>, 795 F.3d at 314. Personal involvement does not necessarily require a showing of direct participation in the challenged

conduct, "but may also be established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

When a plaintiff seeks to impose Section 1983 liability on a municipality, it must be shown that "the challenged acts were performed pursuant to a municipal policy or custom." Littlejohn, 795 F.3d at 314. "The plaintiff need not identify an express rule or regulation." Id. Instead, the plaintiff can show that "a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials." Id. at 315

B.    McDonnell-Douglas Framework in Context of Plaintiff's Claims

As noted above, Plaintiff is not required, at the motion to dismiss stage, to establish a prima facie case of discrimination under McDonnell Douglas. However, Plaintiff's claims must, in accord with the standards referred to above, be plausibly supported by facts showing the required elements of his claims. In light of the standards recited above, for Plaintiff's claims Title VII, Section 1983 and Section 1981 claims to survive, he must plausibly allege adverse employment action, and discriminatory intent. His retaliation claims must plausibly support the retaliation standard for adverse action, as well protected activity and discriminatory intent. See Littlejohn, 795 F.3d 297, 311 (2d Cir. 2015).

Having outlined the facts alleged, as well as the standards applicable to the motion and to Plaintiff's claims, the Court turns to disposition of the motion with respect to those claims that remain, i.e., the claims under Title VII, Section 1981 and Section 1983.

V.    Disposition of the Motion

   A.    Claims of Racial Discrimination

   i.    The Only Actionable Adverse Action is Termination

Broadly construed, Plaintiff's complaint alleges adverse actions in the form of being deprived of a District cell phone, being undermined in his position by the District's assignment of duties to a member of Plaintiff's staff, and by his termination. The first two actions are not attached to any demotion or diminution in pay. Nor do they allege any loss of benefits or materially diminished responsibility. Moreover, the claim that the District paid the cell phone bills of African-American co-workers, while not paying those of Plaintiff, does not even plausibly allege that such cell phones were provided to others with similar duties, or that such a phone was denied to Plaintiff. The allegation states only that Plaintiff observed that the District paid for the bills of other District employees. In any event and however construed, the first two claims of adverse action are clearly insufficient to support a claim of adverse action under Title VII, or Sections 1983 or 1981. Accordingly, they cannot form the basis of any such claim of discrimination. Termination, however, is obviously adverse employment action. The Court therefore turns to address the question of whether Plaintiff's complaint plausibly supports his claim that his termination was motivated by discriminatory intent.

   ii.    Plaintiff Fails to Plausibly Alleged Discriminatory Motivation

Plaintiff claims that the District's decision to terminate his employment was motivated by his race. Title VII requires the pleading of facts supporting a plausible claim that race was at

least a motivating factor in the decision to terminate Plaintiff's. Plaintiff's other claims require plausible support for a showing of "but for" causation.

Plaintiff's Complaint is replete with highly detailed factual allegations. These allegations appear over the course of eighty-four paragraphs. In the context of this motion to dismiss, the Court is bound to construe those allegations broadly in favor of Plaintiff. The Court recognizes that the mere mention of race is not, standing alone, sufficient to show racial discrimination. However, in an effort to make sense out of Plaintiff's Complaint, and in an abundance of caution, the Court lists below all statements in the Complaint that in any way *mention* race, whether or not those statements refers to discrimination against the Plaintiff on the basis of race. Those statements are:

- Plaintiff, who is white, supervised a staff of approximately 75 employees – all of whom were either African American or Hispanic. Compl. ¶ 4; 8.

- The only two employees in Plaintiff's office who were Caucasian were two secretaries. Compl. ¶ 8.

- The two Caucasian secretaries told Plaintiff that the District discriminated against white employees. Compl. ¶ 10.

- The same two secretaries told Plaintiff that Atiba-Weza (who is African American) would not acknowledge Caucasian employees. Compl. ¶11.

- Plaintiff was told by "multiple directors" of "the racist attitude of the District". Compl. ¶ 17.

- Sharon Gardner urged Plaintiff to join a professional/union association while, "gesturing" towards Plaintiff's skin color, and stating, "in this district it is not if you will need them to represent you, but when." Compl. ¶ 18.

- Plaintiff was accused by Armstrong of trying to harm African American children. Compl. ¶ 37.

- At a District meeting, Plaintiff sat on one side of a conference table while the African American members, and meeting invitees sat on the opposite side. During this meeting, Plaintiff was accused of failing to perform job duties, resulting in minority children being put in danger. Compl. ¶ 37.

- Abita-Weza cautioned Plaintiff about their friendly relationship, stating that he was worried that people would question why he is friends with a white man. Abita-Weza then explained that Plaintiff "would not understand as a white guy", and that "they" along with him "would soon find out I am blacker than black." Compl. ¶ 42.

- Plaintiff was not given a District cellphone while the cellphone bills of his African American co-workers were being paid by the District. Compl. ¶ 57.

- Gene Levinstein, a Caucasian male, resigned his position as new Assistant Superintendent after two weeks, and was replaced by an African American former District employee. Compl. ¶ 59.

- Plaintiff was accused by a District Principal of putting minority children at risk of being poisoned. Compl. ¶ 62.

- Abita-Weza assigned Timothy Gregg, Plaintiff's African American assistant, duties beyond his qualifications, without advising Plaintiff of those assignments. Compl. ¶ 69-71

- Plaintiff was directed by Defendant Gilmore to rehire an African American employee, George Wyche, who was previously fired for "egregious behavior" towards a previous superintendent. Compl. ¶ 19.

- Plaintiff refers to Stembridge, an African-American District employee, whose violent behavior was wrongfully tolerated by the District. See Compl. ¶ 63-66.

To summarize, certain of Plaintiff's allegations listed above refer to the alleged racist attitude of the District. Those statements were rumors and opinions communicated by other individuals to Plaintiff shortly his hiring (the two Caucasian secretaries, the organization representative and other District Directors). Other allegations (statements regarding District cell phones and Plaintiff's seat assignment at a meeting) refer to Plaintiff's allegedly disparate treatment when compared to African American employees. Next, there are statements alluding to racial makeup of the students at the District. Those statements link Plaintiff's job performance to its impact on those student (allegations that Plaintiff was somehow putting African American and minority students at risk). A final category of the allegations in Plaintiff's complaint are those referring to decisions with respect to the hiring and firing of District employees, Wyche and Stembridge.

Taken alone or together, Plaintiff's allegations do not allege a plausible claim of discrimination based upon his race. First, the only allegations referring directly to racism are supported by rumors and opinions of other employees as to the overall "anti-white" bias in the District. Those rumors were communicated to Plaintiff by the office secretaries, other District Directors, and Sharon Gardner, a union representative. These statements are nothing more than office rumors. They do not connect Plaintiff's termination to his race, and cannot be relied upon to support a plausible claim of discrimination.

Plaintiff's remaining factual allegations fare no better in cobbling together a plausible claim of racism. Plaintiff states that he was denied access to a District cellphone and tablet, a benefit afforded to other District Directors, and that he observed the cellphone bills of African-

American coworkers were being paid by the District. As noted, the denial of a District paid cellphone is not adverse employment action within the context of Federal anti-discrimination laws. Additionally, allegations as to the District providing cellphones to a group of individuals (that Plaintiff identifies as including an African-American Director) clearly include individuals with different job duties. Moreover, the observation of the payment of other employee cellphone bills is insufficient to plausibly demonstrate that race was a motivating factor in the decision to terminate Plaintiff. Nor do they plausibly support any claim that Plaintiff would have not been terminated but for the fact that he is Caucasian. Neither reference to a completely unrelated individual being fired and replaced by an African-American former District employee, nor Atiba-Weza's direct assignment of certain duties to Plaintiff's African-American assistant do anything to move Plaintiff's allegations of race discrimination into the realm of plausibility.

Allegations that Plaintiff was accused by members of the Board of putting African-American and/or minority children at risk cannot be relied upon to support a plausible claim that Plaintiff was terminated on account of his race. Those statements appear to refer to the consequences of Plaintiff's failure to properly file lead inspection reports, or to other dereliction of his duties. Such statements, if true, do nothing more than reflect the likely minority population of the District and, again, do not speak to either an overall bias against Caucasian employees, or to bias against Plaintiff in particular.

Plaintiff's final references are those recounting statements made by Atiba-Weza, i.e., statements that the Board would not understand his being friends with a White man, and that the Board would soon find out that Atiba-Weza was "blacker than black". With respect to these statements, it is worth recounting that Atiba-Weza, is an African-American individual who hired Plaintiff. He is also alleged to be responsible for his firing, which took place within months of

Plaintiff's hiring. Here, in light of the overall weakness of Plaintiff's pleading as to racial discrimination, and the limited time period between Plaintiff's hiring and termination, the "same actor inference" strongly militates against a finding that neither Atiba-Weza, nor anyone on the Board acted with racial animus when making the decision to terminate Plaintiff.  See Carlton v. Mystic Trans., Inc., 202 F.3d 129, 132 (2d Cir. 2000); Thompson v. Spota, 2018 WL 6163301, *25 (E.D.N.Y. August 23, 2018). This claim is further undercut by Plaintiff's allegations that Atiba-Weza considered Plaintiff to be a friend, as demonstrated by his invitations to socialize.

Plaintiff's lack of a plausible claim of racism is even weaker when considering the fact that Plaintiff was hired to a position in which he supervised a completely minority group of District employees -- an extremely unlikely hiring decision to be made by a District that was racist against Caucasian job applicants and employees. Indeed, credulity is strained by the notion that such a District would go out of its way to hire a Caucasian Director, only to reveal its real racism by firing the same person with in a period of only a few months.

B.    Claims of First Amendment Retaliation

While the bulk of the factual allegations in Plaintiff's complaint refer to racism, the complaint also contains allegations regarding Plaintiff speaking up about District mismanagement. These allegations refer to questionable hiring decisions. They also refer to the wrongful allocation of District resources at the alleged whim of Cross, such as her direction to have District furniture set up for her grandson's birthday party, and for the District to provide her with a driver. Plaintiff also appears to claim that he was subject to adverse employment action because he spoke up about the District's failure to properly pay invoices, and to file lead testing reports in accord with requirements of law.

Defendants argue that Plaintiff's First Amendment claim must be dismissed because the speech was made pursuant to his duties and was therefore not protected speech. This, Defendants argue, is fatal to Plaintiff's First Amendment claim of retaliation.

Upon review of the allegations in the complaint the Court holds, for the reasons set forth above, that the only adverse employment action that is actionable is Plaintiff's termination. With respect thereto, the Court also holds that Plaintiff has alleged fact sufficient to state a claim that he was terminated in retaliation for exercise of his First Amendment rights. This is because it is impossible to hold, at the pleadings stage herein that any speech forming the basis of Plaintiff's First Amendment claim is unprotected as a matter of law. It may be that, upon development of facts during discovery that no speech was, in fact protected. However, at this juncture dismissal is unwarranted. Accordingly, the Court holds that the motion to dismiss Plaintiff's First Amendment retaliation claim is denied.

VI.   Summary of Holdings

Defendants' motion to dismiss is granted in part and denied in part.

All claims that Plaintiff was terminated on account of his race, whether alleged pursuant to Title VII, Sections 1981, 1983 and/or the Equal Protection Clause of the Constitution, are dismissed for failure to allege a plausible claim that Defendants' acts were in any way motivated by Plaintiff's race. In light of the fact that Plaintiff's complaint is already so replete with facts, such claims are recommended to be dismissed without leave to re-plead.

The motion to dismiss Plaintiff's First Amendment retaliation claim is denied with respect to his termination. Accordingly, Plaintiff may proceed to discovery only on his claim that he was terminated in retaliation for exercise of his First Amendment rights.

CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Defendants' motion

appearing as Docket Entry 14 herein be granted in part and denied in part.

OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF.  Any

written objections to this Report and Recommendation must be filed with the Clerk of the Court

within fourteen (14) days of filing of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

72(b).  Any requests for an extension of time for filing objections must be directed to the District

Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing

objections.  Failure to file objections within fourteen (14) days will preclude further review of

this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn,

474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive

right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to

object timely to a magistrate's report operates as a waiver of any further judicial review of the

magistrate's decision").


Dated: Central Islip, New York
        August  21,  2019

                                                     /s/ Anne Y. Shields
                                                    Anne Y. Shields
                                                    United States Magistrate Judge