UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROBERT RAFFERTY,

                              Plaintiff,                              **MEMORANDUM AND ORDER**

   - against -                                                       2:18-CV-3321 (DRH)(AYS)

HEMPSTEAD UNION FREE SCHOOL DISTRICT,
HEMPSTEAD UNION FREE SCHOOL DISTRICT
SCHOOL BOARD, FADHILIKA ATIBA-WEZA,
individually and in his official capacity, REGINA
ARMSTRONG, individually and in her official
capacity, RODNEY GILMORE, individually and in
his official capacity, and BETTY CROSS,

                              Defendants.
-----------------------------------------------------------------X

**APPEARANCES**

**RICOTTA & MARKS, P.C.**
Attorneys for Plaintiff
31-10 37th Avenue, Suite 401
Long Island City, NY 11101
By:    Thomas Ricotta, Esq.

**THE SCHER LAW FIRM LLP**
Attorneys for Defendants
One Old Country Road, Suite 385
Carle Place, NY 11514
By:    Austin R. Graff, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

On October 28, 2019, the Honorable Arthur J. Spatt dismissed with prejudice

seven of eight causes of action in Plaintiff's first Complaint in this case.  *Rafferty v.*

*Hempstead Union Free School District*, 2019 WL 5550261 (E.D.N.Y. Oct. 28, 2019)

(Spatt, J.) [ECF 26].  Plaintiff's First Amendment retaliation claim, however, was

dismissed without prejudice and with instructions to re-plead with "specific factual

allegations demonstrating [Plaintiff] spoke as a private citizen on a matter of public concern." *Id.* at *4.

Plaintiff filed his Amended Complaint on December 12, 2019.  [ECF 29].  He alleges the Hempstead Union Free School District (the "District"), the Hempstead Union Free School District School Board (the "Board"), Fadhilika Atiba-Weza, Regina Armstrong, Rodney Gilmore—each individually and in his or her official capacity as a member of the Board—and Betty Cross (together with Atiba-Weza, Armstrong, and Gilmore, the "Individual Defendants," and collectively, with the District and Board, the "Defendants") retaliated against him in violation of his First Amendment rights.

Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on January 2, 2020.  [ECF 30].  For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

The following facts from the Amended Complaint ("A.C.") are taken as true for the purposes of this Order.

In July 2016, Defendants appointed Plaintiff as "Director of Facilities Level III."  (A.C. ¶ 8).  The position required Plaintiff to direct approximately seventy-five employees in "maintaining the physical school building, keeping the building up to the requisite fire and building codes, [performing] grounds maintenance, [overseeing the] maintenance of leased buildings" and carrying out other maintenance-related functions.  (*Id.* ¶¶ 8–9).  Plaintiff reported to Defendants

Atiba-Weza, Armstrong, and Gilmore, respectively the Superintendent of Schools, the Assistant Superintendent of Primary Education, and the Assistant Superintendent of Human Resources.  (*See id.* ¶¶ 7, 15–16, 25).  Defendant Cross is a former President of the Board who "still wields enormous influence in the District."  (*Id.* ¶¶ 14–15, 19, 54).

In Plaintiff's first month, July 2016, Cross threatened to "have his ass" if he refused to set up school tables and chairs for her grandson's birthday party.  (*Id.* ¶¶ 11–13).  Plaintiff also discovered that the District allegedly appointed many head custodians impermissibly and was cautioned by Atiba-Weza to "tread lightly." (*Id.* ¶ 10).  Plaintiff resisted Gilmore's demand to rehire George Wyche, a former employee terminated for egregious behavior towards a previous superintendent. (*Id.* ¶¶ 16–17).  Plaintiff began to investigate unpaid vendor and contractor invoices. (*Id.* ¶¶ 21–22).

The next month, August 2016, Plaintiff experienced further difficulties when he disobeyed Armstrong's instruction to give more overtime to a custodian with whom Armstrong was engaged in an intimate relationship.  (*Id.* ¶¶ 25–27).  Plaintiff and Armstrong additionally disagreed on the necessity of new school furniture, allegedly purchased without Board approval in replacement of two-to-five-year-old furniture in excellent condition.  (*Id.* ¶¶ 28–30).  Armstrong ignored Plaintiff's concern that the furniture's delivery "would adversely affect the [pre-first day of school] building cleaning," then ordered him to move the old furniture outside the school, and then re-ordered him to move it to an inside asbestos-contaminated area.

(*Id.*).  Plaintiff refused to comply with Armstrong's orders because he would not "participate in the misappropriation of public resources."  (*Id.*).  These incidents culminated in Armstrong making "regular false complaints" and accusations against Plaintiff.  (*Id.* ¶¶ 31–33).  Plaintiff responded by "inform[ing] BOCES of Armstrong's behavior."[1]  (*Id.* ¶ 30).

Also in August 2016, Atiba-Weza demanded Plaintiff drive Cross to her attorney's office, bidding Plaintiff to "make it happen" even if his department "did not have the appropriate vehicles for the job."  (*Id.* ¶¶ 34–35).  Plaintiff accomplished the task—"his driver Maurice" picked her up in a maintenance van—for which Plaintiff received vulgarities from Cross and a verbal reprimand from Atiba-Weza.  (*Id.*).  In a presentation to department heads, Atiba-Weza allegedly forced Plaintiff to speak last, against Plaintiff's wishes and even though Plaintiff was scheduled to perform fire inspections at the time.  (*Id.* ¶¶ 36–37).  Later, Atiba-Weza offered Plaintiff "protect[ion] . . . from the Board" whilst threatening termination if Plaintiff "talk[ed] to him in public[] or acknowledge[d] his presence." (*Id.* ¶¶ 38–40).

Such claimed abuse continued in September 2016.  (*See id.* ¶¶ 41–54).  Atiba-Weza confronted Plaintiff about the District's unfiled lead-test results—over which Plaintiff disclaimed responsibility.  (*Id.* ¶ 41).  Plaintiff, despite "ha[ving] no budget

---

[1]    The acronym "BOCES" refers to the "Board of Cooperative Educational Services," a public organization created by the New York State Legislature to "carry[] out a program of shared educational services" between school districts. N.Y. Educ. Law § 1950(1) (McKinney's 2020).

for the testing," then "called in a favor" from the Nassau County BOCES Executive Director of Health and Safety to get the tests done and reports forwarded. (*Id.* ¶¶ 41–43). Atiba-Weza, who was "'sick and tired of outsiders interfering in Hempstead School District business,'" directed Plaintiff "never again to speak to 'outsiders from Nassau BOCES.'" (*Id.* ¶ 45 (internal quotation marks in original)). Atiba-Weza later publicly criticized Plaintiff for mishandling the testing. (*Id.* ¶ 47).

Also in September 2016, Plaintiff resisted his assigned task to repair leased portable classrooms, claiming the task was not part of his job duties. (*Id.* ¶¶ 48–49). Atiba-Weza, Armstrong, and two attorneys for the District advised him otherwise. (*Id.*). Plaintiff expressed concerns to BOCES that one leased classroom exposed occupants to asbestos. (*Id.*). Armstrong, in response, labeled him an "obstructionist" looking to "spoil[] the [lease] deal." (*Id.* (internal quotations omitted)). Plaintiff also disagreed with Gilmore on whether they should terminate certain employees, who had poor performance and "severe time and leave issues." (*See id.* ¶¶ 50–53).

In October 2016, Atiba-Weza continued to blame Plaintiff for the lead-testing issue and for other, unrelated incidents. (*Id.* ¶¶ 55–56, 61–63). Atiba-Weza again reminded Plaintiff not to speak to BOCES. (*Id.* ¶ 56). Plaintiff filed a "workplace violence charge" after employee Dexter Stembridge "threatened" Plaintiff. (*Id.* ¶¶ 57–58). Gilmore and Atiba-Weza allegedly ignored the issue. (*Id.*).

Cold weather in November 2016 exposed a need to improve the condition of the District's snow removal equipment. (*Id.* ¶¶ 64–66). Plaintiff tried to obtain new

snow plows, but his efforts were blocked by Atiba-Weza and the Purchasing Director. (*Id.*). Atiba-Weza and the Purchasing Director insisted instead that Plaintiff approve payment of outstanding invoices for jobs and supplies predating Plaintiff's appointment. (*Id.*). Plaintiff refused. (*Id.*).

In December 2016, Gilmore transferred Dexter Stembridge to another school, against Plaintiff's recommendation of termination or completion of anger management. (*Id.* ¶¶ 59–60). Plaintiff unsuccessfully tried to terminate Wyche as well. (*Id.* ¶¶ 68–69). Plaintiff alleges Cross is responsible for Stembridge and Wyche's impunity. (*Id.* ¶¶ 19, 59–60, 68–69). Gilmore, a "puppet for Cross," chastised Plaintiff for actions in violation of the union's rights under the collective bargaining agreement. (*Id.* ¶¶ 54, 68–69). Atiba-Weza called a "surprise meeting," refused to let Plaintiff speak, accused Plaintiff of providing "false information about [Messrs.] Stembridge and Wyche," and allegedly "lung[ed] across the table . . . attempt[ing] to grab Plaintiff while screaming." (*Id.* ¶¶ 70–75). Plaintiff was later terminated. (*Id.* ¶ 76).

## DISCUSSION

### I.   Motion to Dismiss Standard

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). The plausibility standard is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. A plaintiff must provide facts sufficient to allow each named defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss. *Iqbal,* 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

## II.   First Amendment Retaliation

A public employee who brings a First Amendment retaliation claim must show: (1) his speech came as a "citizen" on "a matter of public concern; (2) he suffered an adverse employment action; and (3) a causal connection between the speech and the adverse employment action." *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008). Defendants' arguments relate to the first and third elements; they concede Plaintiff's termination was an "adverse employment action." (Def. Mem. at 14). First, Defendants say Plaintiff's speech did not address a matter of public concern; rather, it was made "in the context of his job duties as a public employee, not as a private citizen." (*Id.* at 13–16). Second, Plaintiff failed to plead a causal connection between his speech and termination. (*Id.* at 14–15).

### A.   Speech as a Citizen on a Matter of Public Concern

The First Amendment protects public employee speech only if the employee speaks "[1] as a citizen [2] on a matter of public concern." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

First, a public employee speaks "as a citizen" only if he is not speaking "pursuant to [his] official duties." *Garcetti*, 547 U.S. at 421. "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Speech "pursuant to official duties" can reach beyond that

"required by, or included in, the employee's job description, or in response to a request by the employer." *Ross v. Breslin*, 693 F.3d 300, 305–06 (2d Cir. 2012).

Plaintiff, as Director of Facilities, was required to oversee maintenance of school buildings and grounds. (A.C. ¶¶ 8–9). Plaintiff clearly outlines his responsibilities at Paragraph 10 of his Amended Complaint. He also pleads—and often reiterates—that certain actions were not performed as "part of [his] job responsibilities." (*E.g.*, *id.* ¶¶ 10, 22, 41, 42, 48, 55). These averments guide the Court's inquiry, which is a "practical" one. *Garcetti*, 547 U.S. at 424–25 ("[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting [a] task is within the scope of the employee's professional duties for First Amendment purposes."). In line with the Rule 12(b)(6) standard, all reasonable inferences will be drawn in the Plaintiff's favor. *See Faber*, 648 F.3d at 104.

Second, matters of public concern are those "of political, social, or other concern to the community" or are "subject[s] of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). Any determination on this issue must consider "the content, form, and context of a given statement." *Singer*, 711 F.3d at 339 (quoting *Connick v. Myers*, 461 U.S. 138, 146, 147–48 (1983)).[2]

---

[2]  In the ordinary course, if public employee speech was made as a citizen on a matter of public concern, the next step is to determine, pursuant to *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), "whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Matthews v City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Lane*, 573 U.S. at 242).

Plaintiff claims retaliation for his First Amendment-protected speech to his supervisor and to BOCES. (*E.g.*, A.C. ¶¶ 10, 15, 23, 30, 34, 42–43, 46, 48–49, 59, 66). Plaintiff spoke on six matters: (1) Defendant Cross, (*id.* ¶¶ 11–15, 34–35); (2) new school furniture, (*id.* ¶¶ 28–31); (3) lead testing reports, (*id.* ¶¶ 41–47, 55–56); (4) vendor and contractor payments, (*id.* ¶¶ 21–24, 66); (5) hiring and firing matters, (*id.* ¶¶ 10, 16–17, 25–27, 50–53, 57–60, 67–70); and (6) leased classrooms, (*id.* ¶¶ 48–49). The Court applies the above two-step analysis to each.

### 1. Defendant Cross

Plaintiff alleges retaliation for complaining to Atiba-Weza and Gilmore about Cross's "extort[ing] 'favors' from" District employees and her "use of public resources for non-district business." (A.C. ¶¶ 14–15). Defendants consider these allegations insufficient because Plaintiff never complained to anyone outside his chain-of-command. (Def. Mem. at 5). Plaintiff retorts, "the threshold question is not whether the speech was made to Defendants or to an outside source, but rather, whether the speech related to issues that were ordinarily within the scope of Plaintiff's job duties." (Pl. Opp. at 3 [ECF 34]). Plaintiff also argues that his speech was made as a citizen and that "the misappropriation of school funds . . . in order to provide services and benefits to Betty Cross with respect to private matters is clearly . . . of public concern." (*Id.* at 5). Defendants counter that "Plaintiff's speech to Atiba-Weza and Gilmore was made to the Plaintiff's supervisors, about a matter

---

Defendants, however, make no argument on this point, so the Court need not perform that analysis here. (*See* Def. Mem. at 4–13; Def. Reply at 3–9).

that he was asked to perform within his job duties and responsibilities." (Def. Reply at 4–5 [ECF 35]).

The Court disagrees with Defendants' chain-of-command argument. That Plaintiff "expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work." *Garcetti,* 547 U.S. at 420–21; *Rankin v. McPherson*, 483 U.S. 378, 386 n.11 (1987) ("The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern."); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."). Plaintiff's communications with superintendent Atiba-Weza, (A.C. ¶ 23), are not categorically deprived of First Amendment protection simply because Atiba-Weza was his supervisor. *Ross*, 693 F.3d at 307 ("Speech to a supervisor even in the workplace can be protected as that of a private citizen if it is not made pursuant to the employee's official duties as an employee."); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.,* 444 F.3d 158, 165 (2d Cir. 2006) (holding public employee's private letter to superintendent receives First Amendment protection).

Though the parties agree that Plaintiff complained about "the use of public resources for non-district business," Defendants allege the "use" in question was "part and parcel of the Plaintiff's job with the District." (Def. Reply at 4–5). The

"use" was (i) setting up tables and chairs for Cross's grandson's party and

(ii) arranging Cross's transportation to her attorney's office.  (A.C. ¶¶ 11–15, 34–35).

Although the act of setting up tables and chairs may ordinarily be within the scope

of Plaintiff's maintenance duties, doing so for non-District personnel off school

grounds was not.  (*See id.* ¶ 9 (listing job responsibilities performed for the District

entirely on school grounds or in school buildings)).   Similarly, transportation duties

were not "part and parcel" of his maintenance responsibilities; the allegations

reflect that "security" had ordinarily handled transportation.  (*Id.* ¶ 34).  And this is

to say nothing of transporting non-District personnel on personal business.  (*See id.*

¶¶ 34–35).  Defendants' briefing, devoid of citation, fails to convincingly indicate

otherwise.  (Def. Mem. at 9; Def. Reply at 4–5).  Construing the Amended

Complaint's allegations in Plaintiff's favor, as required, Plaintiff's speech did not

relate to tasks within the scope of his employment, and Plaintiff spoke as a private

citizen.

Absent from Defendants' briefing is whether such speech addressed a matter

of public concern.  (Def. Mem. at 9; Def. Reply at 4–5).  Plaintiff's allegations on this

topic are not a "vehicle for furthering private interests."  *Pappas v. Giuliani*, 2000

WL 1597847, at *10 (S.D.N.Y. Oct. 26, 2000); *see* Pl. Mem. at 5 (arguing this matter

"clearly relate[s] to issues of public concern").  Cross allegedly "has direct input on

all decisions, monetarily or otherwise, that the District makes" and "extort[s]

district employees for money and 'favors' in exchange for their continued

employment."  (A.C. ¶¶ 14–15, 54).  The Amended Complaint thus adequately

describes a matter of public concern, to wit, the impropriety of a private party controlling the use of public funds and other resources. *See Vasbinder v. Ambach*, 926 F.2d 1333, 1340 (2d Cir. 1991) ("[P]otential fraud, theft, and misallocation of public funds[] [are] matters of serious public concern."). As such, Plaintiff adequately pled his speech about Cross was made "as a citizen" on a matter of public concern.

### 2. New School Furniture

Plaintiff also complained about school furniture purchased by Armstrong on the eve of a new school year. (A.C. ¶¶ 28–31). Defendants raise solely causation arguments in moving to dismiss the allegations on this topic. (Def. Mem. at 11 ("Plaintiff does not allege that there was a causal connection between his communications with BOCES regarding Armstrong and his termination."); Def Reply at 6–7 ("Plaintiff does not allege that anyone in the District nor any of the Defendants *knew* that the Plaintiff spoke to BOCES . . . ." (emphasis added))). Causation is addressed *infra* at Section II.B.

Defendants also target Plaintiff's failure to "identify what he told BOCES about Armstrong" – in other words, the "absence of the context and words used by Plaintiff." (Def. Reply. at 6. ("First, the Plaintiff does not identify what he told BOCES about Armstrong and whether his communication with BOCES was with respect to a matter outside the scope of his employment or was about a matter of public concern.")). Defendants argue that the pleadings are too "vague" because "Plaintiff does not identify . . . whether his communication . . . was with respect to a

matter outside the scope of his employment or was a matter of public concern." (*Id.* at 6–7).

First, Federal Rule of Civil Procedure 8 requires only "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Plaintiff is not required to make out a *prima facie* case through his complaint. *Compare Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208 (2d Cir. 2020) ("*Iqbal* does not require a plaintiff to plead a *prima facie* case."), *with* Def. Reply at 6 (Plaintiff's vague allegations are "fatal to his *prima facie* case."). The allegations at-hand do not compare to other First Amendment retaliation pleadings dismissed for vagueness. *See, e.g.*, *Thomas v. Bd. of Educ.*, 2011 WL 1225972, at \*11–13 (E.D.N.Y. Mar. 29, 2011) ("[T]he section of the complaint entitled, 'Factual Allegations,' contains no mention of any speech whatsoever. . . . The complaint does not describe the statements allegedly made by any of the Plaintiffs, much less specify to whom the statements were made or under what circumstances.").

*Winters v. Meyers*, cited by Defendants, involved a plaintiff who "identifie[d] the [First Amendment] conduct at issue" as "expressions of concern." 442 F. Supp. 2d 82, 87 (S.D.N.Y. 2006). The *Winters* Court held plaintiff's vague pleadings were "wholly understandable, since *Garcetti* came down *after* [p]laintiff filed her complaint." *Id.* (emphasis in original). That is, she did not have the benefit of *Garcetti*'s holding in drafting her complaint. The *Winters* Court then granted the plaintiff leave to file a new complaint. *Id.*

Plaintiff's allegations here are better compared to those in *Gagliardi v. Vill. of Pawling*, 18 F.3d 188 (2d Cir. 1994).  The Second Circuit reversed a dismissal of a free speech claim because the "detailed allegations provide a chronology of events from which an inference can be drawn that actions taken by the [defendants] were motivated by or substantially caused by the [plaintiffs'] exercise of their First Amendment rights." *Gagliardi*, 18 F.3d at 195.  "Therefore," the Second Circuit held, "the cause of action for retaliation pleaded in the complaint is sufficient to survive the [defendants'] motion to dismiss." *Id.*  The same result obtains here. Plaintiff sets out a chronology of events, including events related to the "new school furniture" issue, supporting an inference that Defendants' termination of Plaintiff was motivated by Plaintiff's speech.

Second, context sufficiently reveals what Plaintiff shared with BOCES: "Armstrong's behavior" with respect to the new school furniture, culminating in her retaliating against him.  (*See* A.C. ¶ 28 (Armstrong "demanded Plaintiff contact the vendor and make sure the delivery happened." . . .  "[T]he Purchase Director advised Plaintiff that Armstrong purchased this furniture on her own. Upon information and belief, Armstrong used the District's money to purchase this furniture and falsified records to avoid needing [B]oard approval."); *id.* ¶ 30 ("Armstrong next ordered Plaintiff to put all of the old equipment outside of the building. . . .  [Then] Armstrong . . . order[ed] him to instead bring the furniture to an area known to be contaminated with asbestos . . . .  Plaintiff refused to do so because he would not participate in the misappropriation of public resources . . . .")).

Defendants do not address whether Plaintiff spoke "as a citizen on a matter of public concern."  (*See* Def. Mem. at 11–12; Def. Reply at 6–7).  Placing the above arguments under the "Speech on a Matter of Public Concern" header does not suffice.  *Cf. Sioson v. Knights of Columbus*, 303 F.3d 458, 460 n.1 (2d Cir. 2002) ("The second caption in the 'argument' section . . . indicates that [a]ppellant's attorney may have contemplated a proper argument, *i.e.*, one integrating facts and law, but the text that follows the caption makes no reference to the evidence."). Because it is not the Court's "responsibility, especially in a counseled case, to form [defendants'] arguments for [them] by researching the record and relevant case law," the issue will not be addressed.  *See Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 439 n.3 (S.D.N.Y. 2004); *Suarez v. Big Apple Car, Inc.*, 2017 WL 9400686, at *2 (E.D.N.Y. Dec. 1, 2017) ("It is not the Court's job to guess at what a party means to say, or to imagine all defenses they might raise.").  Based on the arguments presented, the Court declines to hold that Plaintiff's speech on the new school furniture was not made as a citizen on a matter of public concern as to the new school furniture.

### 3.   Lead Testing Reports

Plaintiff spoke with Atiba-Weza and BOCES about the District's lead testing and reporting, duties allegedly not part of his job.  (*E.g.*, A.C. ¶¶ 41–42, 44, 55). Defendants argue that key facts on this point changed between the Amended Complaint and the original Complaint.  (Def. Mem. at 7–8).  Regardless, they say, the matter falls within the scope of Plaintiff's official job duties.  (*Id.*)  Plaintiff says

nothing about the change-in-facts between his two complaints and insists lead
testing was not part of his job.  (*See* Pl. Opp. at 4).

The complaints differ on who neglected to perform lead tests before Plaintiff's
hiring.  The Amended Complaint alleges that "the Director of Health Services"
failed to get the lead tests done; the original Complaint laid the blame on "Plaintiff's
predecessor."  (*Compare* A.C. ¶ 42, *with* Compl. ¶ 46 [ECF 1]).  This allegation goes
to the heart of the Court's analysis on whether lead testing was included within
Plaintiff's job duties.  (*See* Def. Mem. at 6–7).  Yet Defendants do not explicitly seek
any particular action from the Court; they simply point out the change as proof of
the Plaintiff's "bad faith" and the case's "frivolous, unreasonable, and groundless"
nature.  The Court understands Defendants to request dismissal of the lead-testing
allegations solely on the basis of the discrepancy.

Courts within the Second Circuit often hold that "prior inconsistent
pleadings, though admissible . . . are controvertible, not conclusive admissions."
*Bernadotte v. N.Y. Hosp. Med. Ctr. of Queens*, 2014 WL 808013, at *5 (E.D.N.Y. Feb.
28, 2014) (internal quotation marks omitted).  They choose the "'more usual and
benevolent option [of] . . . accept[ing] the superseded pleadings but allow[ing] the
factfinder to consider the earlier pleadings as admissions in due course.'"  *Russell v.
Hollister Corp.*, 2014 WL 2723236, at *4 (S.D.N.Y. June 17, 2014) (quoting *Barris v.
Hamilton*, 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999)).  So, "in a typical case, a
prior inconsistent pleading should not trump the Court's obligation under Rule

12(b)(6) to accept a complaint's allegations as true." *Palm Beach Strategic Income, L.P. v. Salzman*, 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011).

But in an *atypical* case, like *Palm Beach Strategic Income, L.P.* itself, a court does not have to accept new, contradictory facts on the motion to dismiss. The *Palm Beach Strategic Income, L.P.* plaintiff "argued consistently, for over two years, through three complaints, and in opposing a motion to dismiss," that the prior facts controlled. *Id.* These circumstances, among others, led the court to ignore the new facts and to accept only those argued from the outset. *Id.* Other courts have been harsher. *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *11–13 (S.D.N.Y. Sept. 24, 2008) (imposing sanctions after amended complaint (i) changed dates to avoid a statute of limitations defense and (ii) retracted allegations and expressly disavowed describing plaintiff as a "lawyer" to avoid contractual defenses, both of which were a "transparent attempt to plead around the legal defenses presented by" defendants).

The situation at hand is more typical than not. True, Defendants' first motion to dismiss quoted the now-contradicted allegation. (*See* Def. Reply at 8 [ECF 20-3] ("It was [Plaintiff's] responsibility to obtain the lead test results (since his predecessor failed to do) . . . . The Plaintiff's speech regarding the failure to file lead test results was a matter related to the scope of his employment.")). But, on balance, the conflicting representations in *Palm Beach Strategic Income, L.P.* and *Colliton* were more egregious. For example, the former involved conduct spanning years and three prior complaints before plaintiff changed the facts. *See Palm Beach*

*Strategic Income, L.P.*, 2011 WL 1655575, at *6.  The latter was a *pro se* prosecution by a former attorney for Cravath, Swaine & Moore LLP, *i.e.*, a sophisticated individual who knew whether he was employed as a lawyer (despite the new allegations' disavowal).  *Colliton*, 2008 WL 4386764, at *6, *14.  For the limited purpose of this Rule 12(b)(6) motion, therefore, the Court accepts the Amended Complaint's allegation that the Director of Health Services failed to perform the lead tests, which task was his responsibility and not Plaintiff's.

Beyond calling attention to the differing allegations in the two complaints, Defendants make no argument on whether the speech was pursuant to Plaintiff's job duties.  They only cite *Garcetti* and *Anderson v. Nassau County Department of Corrections*.  (Def. Mem. at 8).  But those cases merely recite the standard and do not aid the Court in its application to the facts at bar.

The Amended Complaint asserts that Plaintiff was responsible neither for the testing itself (the Director of Health Services was) nor for submitting the reports (Atiba-Weza was).  (A.C. ¶¶ 41, 42, 44).  BOCES, further, was "the principal agency on health and safety matters."  (*Id.* ¶ 56).  BOCES had their Executive Director of Health and Safety, Pete Deluca, "routinely at the school checking on various health conditions."  (*See id.* ¶¶ 43, 56).  If BOCES was responsible, then there is an argument that Plaintiff could not be.  BOCES were "outsiders," per Atiba-Weza. (*See id.* ¶¶ 45, 55).

But the Amended Complaint also contains competing allegations about BOCES and Plaintiff.  They both worked together to bring the District's lead-testing

and reporting into compliance.  (A.C. ¶¶ 42–43 ("[Plaintiff] called in a favor to get the tests done" and "obtained an extension for Plaintiff to file the report.")).  BOCES even "assigned a permanent onsite representative for the District *to work with the Building and Grounds Department* prior to Plaintiff's hiring."  (*Id.* ¶ 45 (emphasis added)).  Though not affirmatively pled, the "Building and Grounds Department" likely refers to Plaintiff's department because a BOCES employee "work[ed] with [Plaintiff] in his office once a week."  (*See id.* ¶ 56).  Plaintiff also pleads that "Plaintiff managed the [Lead Test Program] in full compliance with the law and with the concurrence of Nassau BOCES Health and Safety Division," despite it "not being his responsibility."  (*Id.* ¶ 55).

Nevertheless, whether or not the speech "concerned the subject matter of [Plaintiff's] employment," the issue is "nondispositive."  547 U.S. at 421.  Rather, "the critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties."  *Lane*, 573 U.S. at 239–40.  The Amended Complaint recounts that this matter arose in meetings held by Atiba-Weza and in emails sent by Atiba-Weza.  (A.C. ¶¶ 41–42, 45–47, 55–56).  In both, Atiba-Weza and Plaintiff disagreed over the scope of Plaintiff's job responsibilities.  (*Id.* ¶ 42 ("Plaintiff then explained that he called in a favor to get the tests done . . . despite it not being his job to do so."); ¶ 44 ("Plaintiff also pointed out that Atiba-Weza was responsible for filing the reports."); ¶ 47 ("Atiba-Weza publicly criticized Plaintiff mishandl[ing] the lead testing in the school district despite the fact that it was Atiba-Weza who mishandled the testing.")).  The First Amendment, however, "does

not invest [public employees] with a right to perform their jobs however they see fit." *Garcetti*, 547 U.S. at 423–24.  A public employee's conversation with his supervisor regarding that employee's ability to execute his duties is not protected speech.  *See Ross*, 693 F.3d at 305–06 (quoting *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010)).  Because the context in which Plaintiff spoke was limited to meetings and emails addressing Plaintiff's performance—albeit while disputing *what* he had to perform—the Court holds Plaintiff did not speak as a private citizen. He speech therefore receives no First Amendment protection.

### 4.    Vendor and Contractor Payments

Plaintiff raised a concern over "outstanding vendor and contractor payments" to his superiors and later refused "to prepare confirmatory purchase orders and sign off on jobs and supplies provided before he began working for the District." (A.C. ¶¶ 21–24, 66).  Defendants argue this is non-actionable, "whether it was within the scope of [Plaintiff's] employment or not, [because] the Plaintiff does not allege that he spoke with anyone outside his chain of command." (Def. Mem. at 6–7). Plaintiff's opposes, stating the "investigation [of this matter] was not part of Plaintiff's job duties" the issue is facially a matter of public concern.  (*Id.* at 4–5). Defendants reply that the investigation concerned Plaintiff's "own department that he was appointed to supervise." (Def. Reply at 5).

As set forth above in Section II.A.1, the First Amendment protects speech privately made by a public employee to his employer. *Givhan*, 439 U.S. at 415–16.

Plaintiff's speech on vendor and contractor payments, however, does not merit First Amendment protection because it concerns Plaintiff's official job responsibilities.  His speech was made as an employee, not "as a citizen."  Even viewing the Amended Complaint in the most plaintiff-favorable light, the only vendor and contractor invoices named are those for "exterminator" and "boiler maintenance" services—which are appropriately within Plaintiff's maintenance duties.  (A.C. ¶¶ 8, 24).  Indeed, Plaintiff discovered the unpaid vendor and contactor invoices "in the file cabinets in *his* office" after Plaintiff learned "*he* had no access to *his budget.*"  (*Id.* ¶¶ 21–23, 66 (emphasis added); *see also id.* ¶ 23 ("Plaintiff was then told . . . that the monies would come from Plaintiff's budget.")).  While Plaintiff's job may not have required him to "investigat[e]" this issue, his job requires him to speak to his supervisors about all relevant matters concerning his budget.  (*E.g.*, *id.* ¶ 22).  Unpaid bills connected to his position fall within that category.  Therefore, the First Amendment does not protect Plaintiff's speech on vendor and contract payments.

### 5.   **Hiring and Firing Matters**

Plaintiff's speech also concerned illegally-appointed "head custodians," pressure "to give more overtime to a specific custodian," "severe time and leave issues," and disputes over hiring-and-firing individuals.  (A.C. ¶¶ 10, 16–17, 25–27, 50–53, 57–60, 67–70).  Defendants identify these matters as within the scope of Plaintiff's job duties and not one of public concern.  (Def. Mem. at 10–11; Def. Reply

at 3–4).  Plaintiff argues that this topic reflects Defendants' "violat[ion of] civil service law with respect to hiring practices."  (Pl. Opp. at 4).

The speech at issue clearly fits inside Plaintiff's job duties.  The Amended Complaint describes Plaintiff as "direct[ing] a workforce of approximately seventy-five (75) employees," (A.C. ¶ 8), and details several instances where doing so involved hiring, supervising, and firing custodians, (*e.g.*, *id.* ¶¶ 50, 60, 67–68).  The Court finds unpersuasive Plaintiff's naked allegations to the contrary.  *E.g.*, *id.* ¶ 10 ("Plaintiff spoke to Defendant Gilmore about [the illegally-appointed head custodians] despite it not being in his job description to do so."); *see DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151–52 (2d Cir. 2014) ("Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the [c]omplaint" (internal citation and quotation marks omitted)).  Therefore, Plaintiff's speech on this matter is not entitled to First Amendment protection.

### 6.    Leased Classrooms

Plaintiff's speech related to the leased classrooms likewise receives no First Amendment protection.  (*See* A.C. ¶¶ 48–49).  Plaintiff admits his job responsibilities included "maintenance of leased buildings."  (*Id.* ¶ 9).  Doing so almost certainly requires him to make repairs.  *Maintenance*, OXFORD ENGLISH DICTIONARY (3d ed. 2000) ("The action of keeping something in working order, in repair."); *see* A.C. ¶¶ 48–49.  Whether he had to repair certain leased classrooms but

not others—*i.e.*, whether it was "not his job to maintain" classrooms whose leasing contracts required the "leasing company" to perform repairs, (A.C. ¶ 48)—addresses the scope of his duties and is not protected speech. It reflects Plaintiff's "ability to properly execute his duties." *Ross*, 693 F.3d at 305–06 (quoting *Weintraub*, 593 F.3d at 203).

### 7.   Concluding Thoughts

Finally, the Court addresses Defendants' reliance on *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486 (E.D.N.Y. Mar. 31, 2011) to support dismissing Plaintiff's claims. *Frisenda* can be distinguished on several bases. *Frisenda* involved (1) summary judgment (2) with a plaintiff who conceded that his actions "were within the scope of [his job] duties," leading (3) the court to hold that "all of these undisputed facts paint a clear picture of an employee speaking out about his views regarding how best to perform his job duties." *Id.* at 501–02, 507. On the motion to dismiss here, Plaintiff has made no such concession and the surviving speech does not "paint a clear picture" of Plaintiff speaking out about how best to perform his duties.

In sum, Plaintiff's speech on Defendant Cross and new school furniture survive. (A.C. ¶¶ 11–15, 28–31, 34–35, 41–47, 55–56).

### B.   Causation

First Amendment retaliation claims require "the protected speech [to be] a substantial motivating factor in the adverse employment action." *Cioffi*, 444 F.3d at 167–68. Plaintiffs can make the showing directly, *i.e.*, through "conduct or

statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged retaliatory attitude," or circumstantially, *i.e.*, the "protected activity was followed" close in time to the adverse action. *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003). At the motion to dismiss stage, "facts which could reasonably support an inference" that the defendant harbored retaliatory intent suffice. *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 418 (2d Cir. 1999). "Causation is generally a question for the finder of fact." *Stajic v. City of New York*, 214 F. Supp. 3d 230, 235–36 (S.D.N.Y. 2016) (internal quotation marks omitted) (quoting *DePace v. Flaherty*, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002)). The Court's inquiry here, then, is to "determine whether Plaintiff has alleged facts that could support a reasonable finding of a causal connection." *Stajic*, 214 F. Supp. 3d at 235–36 (internal quotation marks omitted) (quoting *DePace*, 183 F. Supp. 2d at 638).

Defendants ask the Court to apply the "same actor inference to Plaintiff's hiring and firing." (Def. Mem. at 14). "The premise underlying this inference is that if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132 (2d Cir. 2000). But "an invidious intent to discriminate" is not an element of First Amendment retaliation. *See Cioffi*, 444 F.3d at 158; *cf. Vukadinovich v. Bartels¸* 853 F.2d 1387, 1391–92 (7th Cir. 1988) ("Normally, we think of . . . invidious classifications [as] classifications on the basis of such characteristics as race, religion, or gender. Here,

plaintiff is not claiming he was classified on the basis of some forbidden characteristic, only that he was treated differently because he exercised his right to free speech.  We believe this is best characterized as a . . . First Amendment-retaliation claim.").  That is, the "same actor inference" does not arise here.  And it is difficult to see how it could – Plaintiff had not yet uttered his protected speech at the time of hiring, so the "same actor" would have no opportunity to consider it at both hiring and firing.

Defendants next argue that the causation-related pleadings fail because nothing suggests "that any of the decisionmakers—the Board members—had any knowledge of Plaintiff's speech."  (Def. Reply at 9–10).  While Plaintiff will have to "demonstrate that the decisionmakers were aware of the protected speech, . . . at the pleading stage he need only plead a plausible claim of such knowledge." *McDonald v. Hempstead Union Free Sch. Dist.*, 2019 WL 2716179, at *7 (E.D.N.Y. June 28, 2019).  The *McDonald* plaintiff did so by plausibly alleging "that members of the Board and administration with whom he shared [his protected speech] would, in turn, share it with other members of the Board as within the purview of their responsibilities."  *Id.*  Plaintiff does so here, too.  Cross, Armstrong, Gilmore, and Atiba-Weza not only knew of Plaintiff's speech but also reprimanded him for it. (*E.g.*, A.C. ¶ 31 ("Armstrong led verbal attacks against Plaintiff at Cabinet meetings."); ¶ 35 ("[Cross] stat[ed] 'I'll have you fucking fired!' . . .  The next day, Superintendent Atiba-Weza confronted Plaintiff saying that he 'handled the transportation . . . improperly.'")).  It is *not* true that "the Plaintiff does not allege

that anyone within the District knew about his communications with BOCES."
(*Compare* Def. Mem. at 5, *with* A.C. ¶ 55 ("Atiba-Weza then emailed Plaintiff
directing him to never again speak to 'outsiders from Nassau BOCES,' also stating
that he is 'sick and tired of outsiders interfering in Hempstead School District
business.'")).  Allegations likewise support a reasonable inference that Cross,
Armstrong, Gilmore, and Atiba-Weza told the Board about Plaintiff.  Atiba-Weza
and Cross, for example, supposedly had outsized influence over the Board, at least
with respect to hiring and firing.  (*E.g.*, *id.* ¶ 14 ("The [B]oard and the district's
administrator would in turn act on Cross's recommendations serving as her de facto
enforcers."), ¶ 38 ("Atiba-Weza went on telling Plaintiff that he should 'play ball
with him' and follow his lead so he can protect Plaintiff from the Board.'")).  Indeed,
the Board fired Plaintiff "based on Atiba-Weza's recommendation"—which, the
Court parenthetically notes, is the premise for Defendants "same actor" inference
argument.  (*Id.* ¶ 76 ("[A] letter stat[ed] he was being recommended for termination.
The District ultimately adopted that recommendation."); *see* Def. Mem. at 15 ("The
Plaintiff was hired . . . based on the recommendation of Atiba-Weza. . . .  Plaintiff
was fired based upon the recommendation of Atiba-Weza.")).

Therefore, the Amended Complaint plausibly alleges a causal connection
between Plaintiff's speech and his termination.

## CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss is denied in
part and granted in part.  The Court denies the Defendants' motion as it relates to

the allegations about Defendant Cross and new school furniture.  The Court grants

Defendants' motion as it relates to the remaining allegations.

Finally, the docket does not reflect any affidavit reflecting service upon

Defendant Cross, who has not appeared, filed an answer, a motion seeking to

extend the time to respond, or a motion to dismiss.  *See Rafferty v. Hempstead*

*Union Free Sch. Dist.*, 2019 WL 7598671, at *2 (E.D.N.Y. Aug. 21, 2019) (Shields,

M.J.) [ECF 23].  Accordingly, Plaintiff is directed to show cause within 14 days why

the action against Defendant Cross should not be dismissed pursuant to Federal

Rule of Civil Procedure 4(m).

**SO ORDERED.**

Dated: Central Islip, New York       s/ Denis R. Hurley
      November 30, 2020          Denis R. Hurley
                                  United States District Judge